John R. MORRIS, Plaintiff,

v.

WINNEBAGO INDUSTRIES, INC., Winnebago Industries Deferred Compensation Plan, and Administrator of the Winnebago Industries Deferred Compensation Plan, Defendants.

No. C 94–3047–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Nov. 2, 1996.

Helen C. Adams and Brent R. Appel of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, Iowa, and C. Jean Pendleton of Charnetski, Olson, Lacina & Pendleton, Grinnell, Iowa for Plaintiff John R. Morris.

Gene R. LaSuer and Steven L. Nelson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, Iowa, for Defendants.

## MEMORANDUM OPINION ON TRIAL ON THE MERITS

## TABLE OF CONTENTS

I.   PROCEDURAL BACKGROUND ........................................... 919

II.  FINDINGS OF FACT ................................................ 920

III. LEGAL ANALYSIS ................................................. 923
    A.  Interference With ERISA Benefits ........................................ 923
        1.  Elements of an interference claim ...................................... 923
        2.  Interference in this case ........................................... 926
    B.  Breach Of Fiduciary Duty And Violation Of Plan Terms ..................... 927

IV.  CONCLUSION ...................................................... 930

BENNETT, District Judge.

In this action pursuant to the Employee Retirement Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, the plaintiff alleges that his discharge from employment was motivated by a desire to interfere with his expensive benefits in a deferred compensation plan in violation of § 510 of ERISA, 29 U.S.C. § 1140. He also alleges that defendants breached their fiduciary duty and violated the terms of the plan, entitling him to remedies under 29 U.S.C. § 1132. This matter came on for trial before the court on August 13, 1996. The parties subsequently submitted post-trial briefs and the court heard final arguments on September 19, 1996.[1] This matter is now ready for decision on the merits.

## I. PROCEDURAL BACKGROUND

Plaintiff John R. Morris filed his complaint in this matter on June 27, 1994, asserting

---

1. The court finds that this case was exceptionally well tried and briefed by both parties.

three claims pursuant to ERISA. Defendants are Morris's former employer, Winnebago Industries, Inc., and the Winnebago Industries Deferred Compensation Plan and its Administrator (collectively, "Winnebago"). In Count I of his amended complaint, filed on July 5, 1995, Morris alleges that he was wrongfully discharged from his employment as the Director of the Winnebago International Travelers Club (WIT) on January 10, 1991, in violation of § 510 of ERISA, 29 U.S.C. § 1140. Specifically, he alleges his discharge was motivated by Winnebago's desire to avoid the cost of future benefits in a deferred compensation plan (the Plan) to which Morris would have been entitled had he remained employed with Winnebago. In Count II of his complaint, Morris alleges that Winnebago breached its fiduciary duty to him under the Plan by failing to disclose facts or misleading him as to the following: computation of benefits under the Plan; options regarding leaving his deferred salary in the Plan or receiving it at the time of his termination; and the advisability of making a deferral in January of 1991. In Count III of the complaint, Morris alleges that Winnebago violated the terms of the Plan by refusing to allow him to make a contribution in 1991, his fourth year of contributions, and in returning his contributions to the Plan to him upon his termination. Morris seeks relief on Counts II and III pursuant to 29 U.S.C. § 1132.

On August 6, 1996, this court granted in part and denied in part Winnebago's motion for summary judgment on Morris's ERISA claims. The court found genuine issues of material fact precluded summary judgment on Count I and Count II, although the court found Morris's standing to pursue his claims in Count II and Count III was dependent upon his prevailing on Count I. The court granted summary judgment on that portion of Count III claiming that Morris was entitled to leave his contributions in the Plan and Winnebago refused to let him do so. In light of the undisputed fact that Morris had not participated in the Plan for five years at the time of his termination, and in light of the terms of the actual Plan Document, the court concluded as a matter of law that Morris was not entitled to leave his contributions in the Plan upon his termination. However, the court denied summary judgment on the remainder of Count III.

In addition to rendering its decision on trial on the merits, Morris now seeks to have the court reconsider its partial grant of summary judgment on Count III on the ground that the terms of a purported Summary Plan Description (SPD) prevail over the terms of the Plan itself. Morris contends that under the SPD as he understood it, he was entitled to leave his contributions in the Plan at his termination. Morris also asks the court to reconsider its conclusion that his standing to pursue Counts II and III is dependent upon his prevailing on Count I of the amended complaint.

## II. FINDINGS OF FACT

Morris was first employed by Winnebago in November of 1986 as the Director of the Winnebago International Travelers Club (WIT). Morris earned good pay raises and enjoyed positive performance evaluations. As part of his compensation and benefits package, Morris received medical, dental, disability, and life insurance benefits, and was allowed to participate in the Winnebago Supplemental Executive Retirement Plan, book unit rights, stock options, profit sharing, and retirement plans. Among his other benefits, Morris was eligible to participate in the Winnebago Deferred Compensation Plan ("the Plan"), which is central to the present lawsuit. Morris made his first election to participate in the Plan in December of 1987 for the 1988 plan year. Morris made deferments for calendar years 1988 through 1990.

Morris had been an excellent employee for Winnebago, and his employment evaluations reflected that. He improved both the financial condition and level of participation of the WIT program. Furthermore, when asked to do so, Morris had always been able to come up with necessary cuts in the WIT budget. The WIT program itself was beneficial to sales of Winnebago products.

During 1990, Winnebago was experiencing serious financial difficulties, and set about addressing its changed circumstances, in part, by eliminating jobs to cut costs. Mor-

ris was terminated on January 10, 1991, at least ostensibly as part of this program of job eliminations. In the twelve months preceding Morris's termination, Winnebago terminated over 130 salaried employees, and most of the terminations resulted from job eliminations. Morris does not contest that Winnebago had serious financial difficulties or that employee terminations and job eliminations were part of its program to combat the problem. He also admits that his termination was to "save money," and that no one at Winnebago told him a substantial cause for his termination was to avoid paying benefits rather than to save money by eliminating his position.

When Morris was terminated, the majority of his duties were assumed by his former subordinate, Karen Ebaugh. Ms. Ebaugh's and Morris's positions were consolidated, in that Ms. Ebaugh continued to be responsible for her own former duties as well as most of Morris's, but some of the former duties of both Ebaugh and Morris were done by others, or simply not done at all. Thus, a position was eliminated from the WIT division at the time of Morris's termination.

Upon Morris's termination, Winnebago tendered back to Morris his contributions to the Winnebago Deferred Compensation Plan and subsequently refused to allow Morris to leave his contributions in the Plan to accumulate further or to allow Morris to make any further contributions to the Plan. Morris does not dispute the amounts he received for severance pay and vacation time. Morris also admits that Winnebago did not violate the terms of any employee benefit plan in which he participated, with the important exception of the Winnebago Deferred Compensation Plan.

Although the parties dispute their meaning, the parties do not dispute that the Deferred Compensation Plan Information Booklet for 1990, which was distributed to employees, has the following pertinent explanations of benefits in question and answer form:

*9. Is there any age or service requirement for electing a deferred income benefit award?*

Regardless of your age, if you are a newly eligible Plan participant you may make a deferral election within 30 days after you've been given the opportunity to defer. However, in all other circumstances, eligible employees who are age 55 or older must have at least 15 years of service to participate in the Plan.

\* \* \* \* \* \*

*17. How are benefits determined if I voluntarily terminate my employment prior to being eligible for early retirement benefits?*

One of the primary reasons Winnebago is offering this Plan to key management employees is to encourage them to continue employment with Winnebago until they reach normal retirement age. If you terminate your employment prior to 5 years' participation in the Plan and attaining the age of 55 years or 20 years of service, you will be entitled to a return of your deferrals plus 6% interest compounded annually. This decision was motivated by the recognition that excessively high rates of return should not be associated with the benefits paid to those participants who terminate early as defined above.

Defendant's Trial Exhibit C, Winnebago Deferred Compensation Plan Information Booklet, December 1990 (hereinafter "Plan Information Booklet"), pp. 4, 5. Although the quoted portion identified here as the answer to question number 9 was the result of planned amendments to the Plan contemplated in 1989, and this question and answer were made part of the Plan Information Booklet in 1990, the Plan itself was never amended to reflect these changes.

Whatever the meaning of the pertinent provisions of the Plan Information Booklet, Morris was allowed to make contributions to the Plan in 1990. The parties do not dispute that at the time of his termination, Morris had participated in the Plan for four years and had attained the age of 55. The parties do not dispute that Morris was not terminated voluntarily, and the parties have not identified, and the court has not found, any portion of the Plan Information Booklet or the Plan itself that explicitly states that it pertains to eligibility to make contributions or to

receive payments upon involuntary termination.

The Plan Information Booklet carries the following disclaimer:

*This booklet is designed to communicate the principal features of the Plan. The Plan as described herein is based on an official Plan Document. If there is any discrepancy between this booklet and Plan Document, the Plan Document will govern.*

Plan Information Booklet, p. 10. The Plan Document referred to in this disclaimer, is Plaintiff's Trial Exhibit 3, which became effective September 12, 1990.

The provision of the Plan Document comparable to question 17 of the Plan Information Booklet, Section 7.4, provides, in pertinent part, as follows:

*Section 7.4—Benefits Upon Early Retirement.* Upon a Participant's Termination of Services prior to the Normal Retirement Date the Employer shall pay to the Participant, as compensation for services rendered prior to such Termination of Services, the following benefits:

(a) If the Termination of Services occurs:

(i) before the Total Deferral is completed, *or*

(ii) before the Participant completes 5 years of participation under the Plan, *or*

(iii) before completion of twenty (20) Years of Service, *and* before the Participant attains the age of fifty-five (55) years,

the Employer will pay the Participant an amount equal to the aggregate of all Stated Deferrals previously deferred hereunder together with interest compounded annually on all such amounts, beginning with the dates the deferrals were made and continuing until paid, at the rate determined from time to time by the Committee. Such payment will be a single payment made on the 180th day following the Termination of Services, and will completely discharge the Employer's obligations under the Plan.

(b) If the Termination of Services occurs:

(i) after the Total Deferral is completed *and*

(ii) after the Participant completes at least 5 full years of participation under the Plan *and*

(iii) after the Participant attains the age of fifty-five (55) years *or* after completion of twenty (20) Years of Service,

the Employer shall pay to the Participant the Normal Benefit in 180 equal monthly installments commencing on the Normal Retirement Date and continuing on the first day of each month thereafter, unless the Participant has elected to receive the actuarial equivalent of his Normal Benefit in an alternative benefit form beginning earlier than his Normal Retirement Date, but after his Early Retirement Date, based on the reduction factors illustrated on Table 3 enclosed with the Participation Agreement. Such election must be made by the Participant prior to the Effective Date. In the event a Participant so elects an alternative benefit form, the payments shall commence on the date designated on such election, or upon Termination of Services, whichever shall later occur.

Amended And Restated Winnebago Industries, Inc., Deferred Compensation Plan, Effective September 12, 1990, Plaintiff's Trial Exhibit 3, pp. 7–8.

Winnebago was first advised of potential high costs of the deferred compensation plan and recommendations for curbing those costs, including limiting participation of older employees, in a report from consultants, the Todd Group, sometime prior to Morris's termination. However, Winnebago executives had not fully digested the impact of the consultants' recommendations prior to Morris's termination. Instead, although some attempts were made by the administrators of the Plan to adjust eligibility requirements, no amendments to the Plan documents themselves limiting eligibility were made prior to Morris's termination. Nor can the court find that concerns over the cost of Morris's deferred compensation benefits was a motivating factor in his discharge, because the court finds that only Morris's salary, not his bene-

fits package, was considered in the budgetary considerations that led to his termination.

## III. LEGAL ANALYSIS

### (including some further findings of fact)

Morris asserts three different claims of ERISA violations. Count I alleges that his discharge was in violation of ERISA § 510, 29 U.S.C. § 1140, because its purpose was to interfere with his rights in the deferred compensation plan. Count II alleges breach of fiduciary duty in misleading or incorrect disclosures of the terms of the Plan. Count III alleges violation of the terms of the Plan in Winnebago's refusal to allow Morris to make contributions to the Plan for 1991.[2] The court will consider each of these claims in turn.

### A. Interference With ERISA Benefits

■ Section 510 of ERISA, codified at 29 U.S.C. § 1140, makes it unlawful for an employer to discharge an employee for the purpose of interfering with ERISA rights:

> **§ 1140. Interference with protected rights**
>
> *It shall be unlawful for any person to discharge,* fine, suspend, expel, discipline, or discriminate against *a participant* or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 *et seq.*], or *for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan,* this subchapter, or the Welfare and Pension Plans Disclosure Act....

29 U.S.C. § 1140 (emphasis added). Thus, this section forbids, and gives rise to wrongful discharge claims for, both "retaliation" for exercise of ERISA plan rights, and, as is alleged in this case, "interference" with future ERISA plan benefits. *Kinkead v. Southwestern Bell Telephone Co.,* 49 F.3d

454, 456 (8th Cir.1995) (recognizing both retaliation and interference claims under § 1140); *Morrison v. FirsTier,* 26 F.3d 65, 67 (8th Cir.1994) (§ 1140 is the basis for a claim of interference with ERISA plan benefits); *accord Kowalski v. L & F Prods.,* 82 F.3d 1283, 1287 (3d Cir.1996) ("[T]he plain language of § 510 provides a cause of action for employees who have been discharged 'for exercising any right' to which employees are entitled ... under an ERISA-protected benefit plan. But § 510 also goes further, protecting employees from interference with the 'attainment of any right to which [the employees] may become entitled.' ").

### 1. Elements of an interference claim

■ In order to recover on a § 510 interference claim, the employee must show " '(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.' " *Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533, 1543 (3d Cir.1996) (quoting *Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987)); *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 922 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). There can be no dispute that the first and third elements of this claim have been shown here. The parties do not dispute that Morris was involuntarily discharged from his position, *Fischer,* 96 F.3d at 1543 (actions listed in § 510 as giving rise to a discrimination claim are being " 'discharge[d], fine[d], suspend[ed], expel[led], [or] discipline[d],' " quoting the statute, as edited by that court); *see also Morrison,* 26 F.3d at 67 (judgment as a matter of law was proper where, on an interference claim, the ERISA plaintiff had failed to show she was discharged), although whether or not that termination was "prohibited" by ERISA depends upon whether it was for an improper purpose. Morris's discharge also undisputably precluded him from attaining any rights under the deferred compensation plan. *Id.* (the third element of a § 510 claim is that the employer's conduct

---

**2.** Morris also asks the court to reconsider here its dismissal of the portion of Count III alleging violation of the terms of the Plan in Winnebago's

return of Morris's contributions upon his termination, instead of allowing Morris to leave them in the Plan to accumulate further.

interfered with attainment of any right to which the employee may become entitled under the ERISA plan). Thus, the fighting issue in this case is whether Morris has established the second element of his § 510 claim, that is, whether he has established that his discharge was taken "for the purpose of interfering" with his rights under the Plan. *Id.*[3]

■ On this element of Morris's interference claim, the dispute is not just what the evidence shows, but what level of "purpose" that evidence must show. Morris contends that he need not show that Winnebago had the "specific intent" to interfere with his ERISA benefits, but that good policy reasons, based on an analogy between ERISA and Title VII, counsel a more liberal construction, proscribing discrimination whether it was intentional or unintentional. However, Morris contends that even if "specific intent" is required, he is still only required to show that intent to interfere with his ERISA benefits played some motivating role in his discharge. Winnebago argues that, contrary to the court's comments in the summary judgment ruling concerning some uncertainty among the circuit courts of appeals over whether "specific intent" was required, every

court to decide the question has found such a requirement.

The court agrees that, although some courts have dodged the question, *see Kowalski v. L & F Prods.*, 82 F.3d 1283, 1291 (3d Cir.1996) ("We need not and do not determine whether specific intent is an essential element of a § 510 cause of action," because there was sufficient evidence in the summary judgment record from which to infer such intent), every court that felt compelled to decide it has held that "specific intent" to interfere with ERISA rights is a required element of a § 510 claim. *See Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 242 (6th Cir.1996) ("[A] plaintiff under § 1140 must demonstrate that the action at issue was taken with the specific intent to violate ERISA...."); *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 761 (5th Cir.1996) (proof of a violation of § 510, or even a *prima facie* case under that section, requires proof that the employer acted "with specific discriminatory intent"); *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir.1996) (reiterating its holding that "the plaintiff 'must show that an employer had a specific intent to violate ERISA,'" quoting *Humphreys v. Bellaire Corp.*, 966

---

**3.** Winnebago asserts that the first fighting issue is whether Morris has even established a *prima facie* case of interference. The Eighth Circuit Court of Appeals and other courts have recognized that wrongful discharge claims under § 510 of ERISA "are analyzed using the three-stage framework common to Title VII and ADEA cases." *Kinkead*, 49 F.3d at 456; *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir.1992); *accord Kowalski*, 82 F.3d at 1288 ("We have held that the presumptions and shifting burdens of production used in employment discrimination cases are equally applicable in the context of discriminatory discharge cases brought under § 510 of ERISA."); *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 330 (1st Cir.1996) (an ERISA "interference" claim is analyzed according to "the same three stage burden-shifting paradigm" as Title VII or ADEA cases). Thus,

> if a claimant is able to establish a prima facie case of violation of § 510, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. If the employer does so, the burden shifts back to the claimant to prove that the proffered reason is pretextual.

*Kinkead*, 49 F.3d at 456; *Rath*, 978 F.2d at 1089–90; *accord Kowalski*, 82 F.3d at 1289. However,

this court found, when disposing of Winnebago's motion for summary judgment, that Morris had indeed stated a *prima facie* case of interference, albeit a very weak one. The court does not feel compelled to retreat from this conclusion on the basis of the trial record, although that trial record did little to enhance what the court perceived to be a very weak *prima facie* case, for two reasons. First, once the employer has met its burden of presenting a legitimate, non-discriminatory reason for adverse action, just as in a Title VII case, the *prima facie* case simply "drops out of the picture," *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37–38 (1st Cir.1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)), *cert. denied*, ___ U.S. ___, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996), and Winnebago has asserted such a legitimate, non-discriminatory reason for terminating Morris, its financial difficulties. Second, once the *prima facie* case drops out of the picture, the ultimate issue in an ERISA § 510 case, as in a Title VII case, is whether intentional discrimination has been demonstrated. *Id.* The court here will simply focus its energies on this ultimate question, rather than reconsidering the issue of the adequacy of the *prima facie* case.

F.2d 1037, 1043 (6th Cir.1992)); *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 330 (1st Cir.1996) (an element of a § 510 claim is proof of "'the specific intent of interfering with the employee's ERISA benefits,'" quoting *Barbour, infra*); *Barbour*, 63 F.3d at 37–38; *Hines v. Massachusetts Mut. Life Ins. Co.*, 43 F.3d 207, 209 (5th Cir.1995) ("An essential element of a Section 510 claim is proof of defendant's specific discriminatory intent."); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir.1995) (an ERISA plaintiff's claim failed when she failed to prove that her employer "had a specific intent to interfere with her pension rights under § 510 of ERISA," citing *Conkwright v. Westinghouse Elec. Co.*, 933 F.2d 231, 238 (4th Cir.1991)); *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir.1995) (adopting the view of the Second Circuit Court of Appeals in *Dister, infra*, that specific intent to interfere with an employee's benefit rights is critical in § 510 cases, and, because that intent may be shown by indirect proof, applying the burden-shifting analysis from Title VII and ADEA cases employed in *Dister*); *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1491 (11th Cir.1993) (requiring proof of "specific intent" to interfere with ERISA benefits); *McGann v. H & H Music Co.*, 946 F.2d 401, 404 (5th Cir.1991), *cert. denied sub nom. Greenberg v. H & H Music Co.*, 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988).

However, the court has found no case indicating how this requirement is functionally different from the required showing of intent to discriminate under Title VII. Indeed, courts consistently define "specific intent" to violate ERISA as meaning "that a motivat-ing factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits." *Abbott*, 94 F.3d at 242 (emphasis added); *Shahid*, 76 F.3d at 1411 (although the statute says the adverse employment action must be "for the purpose" of interfering with prospective ERISA benefits, "the [employee] need not show that the employer's sole purpose in discharging [the employee] was to interfere with [the employee's] entitlement to benefits but rather only that it was 'a motivating factor' in the decision," quoting *Humphreys*, 966 F.2d at 1043); *Daughtrey*, 3 F.3d at 1491 (requiring proof of "specific intent" to interfere with ERISA benefits, but nonetheless only requiring proof that ERISA benefits were "a motivating factor" in an adverse employment decision); *and compare Kehoe v. Anheuser–Busch, Inc.*, 96 F.3d 1095, 1102 (8th Cir.1996) (under Title VII or the ADEA, evidence that will suffice to show intentional discrimination is evidence that unlawful discrimination was a motivating factor in a plaintiff's termination); *Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 510 (8th Cir.1996) (the trial court properly instructed the jury in a sex discrimination case under Title VII that it must find the employee's sex was a motivating factor in the employer's decision even though the court gave no other instruction on intent); *Rothmeier*, 85 F.3d at 1336 (intent to discriminate in a Title VII or ADEA case is shown from evidence permitting an inference that the protected characteristic was a motivating factor in the plaintiff's termination); *Pedigo v. P.A.M. Transp., Inc.*, 60 F.3d 1300, 1301 (8th Cir.1995) (noting that relief is available under the ADA or Title VII where the protected characteristic is a motivating factor in the employer's adverse decision, citing 42 U.S.C. § 2000e–2(m)).[4] Thus, the court must con-

---

4. Contrary to Morris's assertion that liability for "unintentional" discrimination may be imposed under Title VII and the ADA, *see* Plaintiff's Post Trial Brief, p. 12 ("Title VII and the ADA seek to end discrimination, intentional or unintentional, because the harm discrimination visits on the protected individual is the same whether it is intentional or unintentional."), this court knows of no court, apart from one considering a disparate impact case, that has imposed liability for unintentional discrimination. Morris has cited no decision imposing liability for unintentional discrimination on a comparable claim and this is not a disparate impact case. Thus, apart from

disparate impact cases, only intentional discrimination can incur liability under Title VII, the ADA, or ERISA. However, as the court discussed in the body of this opinion, the analogy remains viable between what level of intent must be proved in ERISA cases and Title VII cases, despite the rubric of "specific intent" in ERISA cases: in either kind of case, what must be proved is that interference with ERISA benefits or a plaintiff's protected status was "a motivating factor" in the adverse employment decision.

Winnebago's argument that the court should not take the "middle ground" approach of *Roth-*

sider whether Morris has demonstrated that interference with his ERISA-protected benefits under the deferred compensation plan was "a motivating factor" in his discharge in order to prove the requisite "specific intent" under § 510. *Abbott*, 94 F.3d at 242; *Shahid*, 76 F.3d at 1411; *Daughtrey*, 3 F.3d at 1491; *Humphreys*, 966 F.2d at 1043. The court finds that Morris has not made such a demonstration.

### 2. Interference in this case

■ Morris's termination was undeniably made to "cut costs" to Winnebago. However, the evidence convinces the court that it was Morris's salary that was considered in deciding to terminate him, not his participation in the deferred compensation plan. The witnesses involved in the decision to terminate Morris testified credibly that the only "cost" of his position they considered was his salary. The persons who made the decision to terminate Morris, Mr. Dohrmann and Mr. Cooley, agreed that the termination was necessary to meet the current budget problems by cutting Morris's salary from the WIT budget. Mr. Cooley specifically testi-

fied that what he and Mr. Dohrmann looked at was "a salary figure," not overhead costs or benefit costs. John Green, Winnebago's chief of personnel, testified that the figure Winnebago uses when reducing the budget is "the salary figure." Trial Testimony of John Green, Draft Trial Transcript, Vol. II, p. 199.[5]

Also, although Morris showed that Winnebago had been advised by the Todd Group consultants that it should cut costs in the deferred compensation plan at some point prior to Morris's termination, the evidence does not demonstrate that Morris's discharge was prompted by that concern. Indeed, the evidence suggests that Winnebago officials had not digested the impact of the recommendations concerning the deferred compensation plan at the time of Morris's termination. Furthermore, at that time, Winnebago was under immediate budgetary constraints, such that cutting current salary was an expedient solution, while cutting participants in a deferred compensation plan would have had only a more distant impact.

*meier v. Investment Advisers, Inc.*, 85 F.3d 1328 (8th Cir.1996), but should instead require "specific intent" is also inapposite, however. *Rothmeier* establishes the guidelines for what must be shown to avoid summary judgment, finding that in *Hicks*, the Supreme Court

> struck a middle ground ... refusing to adopt either pretext-only or pretext-plus as the exclusive test for sufficiency of the evidence in employment discrimination cases. Instead, the test fashioned by the Court for the third stage of the *McDonnell Douglas* analysis is more fact sensitive: whether the employee has provided evidence from which a reasonable factfinder could conclude that the employer intentionally discriminated against the employee for a prohibited reason.

*Rothmeier*, 85 F.3d at 1334 (citing *Hicks*, 509 U.S. at 510–11, 113 S.Ct. at 2748–49). Thus, the court stated the following rule in this circuit for what an age-discrimination plaintiff must show to defeat summary judgment, which this court here modifies to state the rule in terms of an ERISA-discrimination plaintiff:

> [A]n [ERISA]-discrimination plaintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [entitlement to prospective ERISA benefits] was a determinative factor in the adverse employment decision. The second part of this test sometimes may be satisfied without

> additional evidence where the overall strength of the *prima facie* case and the evidence of pretext "suffice[s] to show intentional discrimination." The focus, however, always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's [entitlement to prospective ERISA benefits].

*Rothmeier*, 85 F.3d at 1336–37 (modified to state the rule in terms of an ERISA "interference" claim). Thus, *Rothmeier* explains what evidence is sufficient to find intentional discrimination; it does not suggest that intentional discrimination, or "specific intent" to interfere with ERISA benefits, is not required.

5. In resisting Winnebago's summary judgment motion, Morris relied heavily on John Green's deposition testimony as demonstrating that Morris's termination was not "done right." However, at trial, in response to direct questions about whether there was "anything wrong" with Morris's termination or how he would "classify" that termination, Green testified that he saw nothing wrong with the termination as it was "[t]he same thing as we've done in the past. I felt sorry for John Morris, but I knew for economic reasons that we had to cut people." Trial Testimony of John Green, Draft Trial Transcript, Vol. II, p. 197.

Finally, the court cannot find that Morris's termination was motivated by a desire to interfere with his deferred compensation benefits because Karen Ebaugh, one of Morris's former subordinates, assumed the majority of his duties. The court finds from the record at trial that Ms. Ebaugh's and Morris's positions were consolidated, that Ms. Ebaugh continued to be responsible for her own former duties as well as most of Morris's, and that some of their former duties were done by others or simply not done at all. In light of these·facts, Morris's termination was part of an actual job elimination, not a mere "sham." Some consolidation of duties is necessarily to be expected in a reduction-in-force case. *Kunzman v. Enron Corp.*, 902 F.Supp. 882, 896 (N.D.Iowa 1995) (in an age-discrimination case, the court noted that in a reduction in force, a job is either eliminated or combined with another). The question is whether Morris's job continued to exist in its various parts. *See, e.g., Fink v. Kitzman*, 881 F.Supp. 1347, 1364 (N.D.Iowa 1995) (citing *Hardin v. Hussmann*, 45 F.3d 262, 265 (8th Cir.1995), as stating survival of a job in its various parts as one of the elements of a *prima facie* case of age discrimination in a reduction-in-force case). Here, although much of Morris's job was still to be done by remaining employees, a true job elimination did occur, resulting in consolidation of tasks among remaining employees. However, even giving Morris every possible inference from the nature of the consolidation of positions in the WIT division, how his duties were assumed in his absence does not suggest that interference with his ERISA benefits was the purpose behind his termination.

The court is of the view that terminating Morris was a poor choice under the circumstances, because his performance of his job had been excellent, and there was every likelihood that Morris could have found acceptable ways to make cuts in the WIT budget comparable to cutting his salary. However, Winnebago was entitled to make the choice it made in the exercise of its business judgment. *See, e.g., Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995) (absent intentional discrimination by employers, federal courts are not to sit as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers"); *Walker v. AT & T Technologies*, 995 F.2d 846, 849–50 (8th Cir.1993) (an employer has the right to make business judgments, so long as they are made in a nondiscriminatory manner). Although Morris had always met demands to make budget cuts in the past, and suggested at trial a number of ways he could have saved an amount of money equivalent to his salary had he been asked, nothing compelled Winnebago to consider alternatives to terminating Morris as long as his termination was not. motivated by an improper purpose. *Id.* The court finds no such improper motivation here. Any interference with Morris' ERISA benefits was merely "incidental" to an adverse employment action motivated by a need to cut costs. *Lehman,* 74 F.3d at 331 ("ERISA provides no relief if the loss of an employee's benefits was incidental to, and not the reason for, the adverse employment action. .Were this not so, every discharged employee who had been a member of a benefit plan would have·a potential cause of action against his or her former employer under ERISA."); *Daughtrey,* 3 F.3d at 1492 (" '[M]easures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent.. Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular' " quoting *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1224 (11th Cir.1993)). Morris's § 510 "interference" claim in Count I therefore fails upon full consideration of the evidence offered at trial.

### B. Breach Of Fiduciary Duty And Violation Of Plan Terms.

■ Morris's remaining claims, claims of breach of fiduciary duty and claims of violation of terms of the deferred compensation plan, are brought pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). In its summary judgment ruling, the court held that Morris would have standing to pursue his claims of breach of fiduciary duty and violation of Plan terms pursuant to 29 U.S.C. § 1132 only if he prevailed on his wrongful

termination claim, citing *Adamson v. Armco, Inc.*, 44 F.3d 650 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995). Morris's first contention that he has standing to pursue his claims of breach of fiduciary duty and violation of Plan terms was that he had indeed proved a violation of § 510 entitling him to reinstatement to his employment and participation in the Plan. That contention cannot stand in the face of the court's conclusion in the prior section.

However, Morris also contends that he has standing to assert his remaining claims, because he has a colorable claim to vested benefits. Specifically, he contends that he would still have funds in the plan had Winnebago honored the proper interpretation of the answer to Question No. 17 in the Plan Information Booklet. He asserts that the Supreme Court's decision in *Varity v. Howe*, —— U.S. ——, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), is "analogous" to the question of his standing in this case, and that it cautions against leaving wronged employees without a remedy. *See Varity*, —— U.S. at ——, 116 S.Ct. at 1079. He also contends that, despite language apparently narrowing it, *Adamson* recognized a broad exception to the requirement that a person be a plan "participant" in order to have standing to pursue a claim under § 502(a)(3), that is, that a former employee has standing where "but for the employer's conduct alleged to be in violation of ERISA," the former employee would be a plan participant. *Adamson*, 44 F.3d at 654. Thus, Morris asserts that he has standing if he can show that any section of ERISA was violated. Morris asserts that the statement in *Adamson* that "[t]his exception only applies when the fiduciary's breach of duty has deprived the § 502(a)(2) or § 502(a)(3) plaintiff of participant status," *Adamson*, 44 F.3d at 655, was not intended to narrow the exception, because only a breach of fiduciary duty claim was asserted in *Adamson*.[6]

First, the court finds that the Supreme Court's decision in *Varity* is not "analogous." The Court was not there considering whether

the plaintiffs had "standing," but instead considered under which provision of ERISA plaintiffs with standing could obtain relief for the particular wrong claimed. *Varity*, —— U.S. at ——, 116 S.Ct. at 1079. The Court did say, as Morris contends, that

[t]he plaintiffs in this case could not proceed under the *first* subsection [§ 502(a)(1)] because they were no longer members of the Massey–Ferguson plan and, therefore, had no "benefits due [them] under the terms of [the] plan." § 502(a)(1)(B). They could not proceed under the *second* subsection [§ 502(a)(2)] because that provision, tied to § 409, does not provide a remedy for individual beneficiaries. [*Massachusetts Mut. Life Ins. Co. v.*] *Russell*, [473 U.S. 134,] 144, 105 S.Ct. [3085,] 3091 [87 L.Ed.2d 96 (1985)]. They must rely on the *third* subsection [§ 502(a)(3)] or they have no remedy at all. We are not aware of any ERISA-related purpose that denial of a remedy would serve.

*Varity*, —— U.S. at ——, 116 S.Ct. at 1079. However, a careful reading of *Varity* shows that the Court was not aware of any ERISA-related purpose that denial of a remedy *to litigants with standing* would serve. "Standing" was not an issue, because the defendant had conceded that the plaintiffs were plan "participants" or "beneficiaries," and thus satisfied the "standing" requirement. *Id.* at ——, 116 S.Ct. at 1075.

Morris cannot assert the specific, narrow exception for standing recognized by the Eighth Circuit Court of Appeals in *Adamson*, because no reading of his claim could be that the breach of fiduciary duty deprived him of participant status. *Adamson*, 44 F.3d at 655 ("This exception only applies when the fiduciary's breach of duty has deprived the § 502(a)(2) or § 502(a)(3) plaintiff of participant status."). Morris's claim is that either his termination or violation of the terms of the Plan itself deprived him of participant status, while the allegedly misleading disclosures of Plan terms, made in breach of fiduciary duty, if such disclosures had actually represented the terms of the Plan, would

---

**6.** This court suggested this possible interpretation of *Adamson* in its summary judgment ruling, but did not decide that *Adamson* recognized the broader rather than the narrower exception.

have allowed him to *maintain* his participant status by leaving his contributions in the Plan upon termination.

What of Morris' assertion of a broader exception? Although this court is inclined to believe, at least in the first instance, that the Eighth Circuit Court of Appeals meant precisely what it said when it stated that the standing exception *"only* applies when the fiduciary's breach of duty has deprived the § 502(a)(2) or § 502(a)(3) plaintiff of participant status," *Adamson,* 44 F.3d at 655 (emphasis added), only that exception would have mattered in the *Adamson* case where only a claim for benefits and a claim of breach of fiduciary duty were alleged. Logically, if the violation of ERISA of breach of fiduciary duty deprives the plaintiff of participant status, and such a violation creates an exception for standing, another violation of ERISA that deprives the plaintiff of participant status should also provide an exception for standing. Even assuming this to be true, however, Morris does not have standing in this case.

Morris asserts that violation of Plan terms deprived him of participant status, because he should have been allowed to leave his contributions in the Plan even after his termination. The court concluded in its summary judgment ruling that the terms of the Plan itself had not been violated. To reiterate, Section 7.4(a) of the actual Plan Document is applicable to Morris's termination, notwithstanding his argument that the comparable language in the Plan Information Booklet is initially cast only in terms of a "voluntary" termination, not an involuntary one. The title of Section 7.4 refers not to "voluntary" termination, but to "Benefits Upon Early Retirement." Plan Document, § 7.4, p. 7. The language of the section refers only to "Participant's Termination of Services prior to the Normal Retirement Date," not to any specifically voluntary termination of employment by the employee. *Id.* The general applicability of the provision to any termination prior to normal retirement, including involuntary terminations, is

clarified by the definition of "Termination of Services" in the Plan Document. That definition of "Termination of Services" is "the severance of the Participant's employment with the Employer or termination of the Participant's service on the Board, as the case may be." Plan Document, § 3.21, p. 3. This provision, by its unambiguous terms, refers to any severance or termination, not just to voluntary ones. Thus, as a matter of law, Morris was not entitled to leave his contributions in the Winnebago Deferred Compensation Plan upon his termination in January of 1991, because he did not have the five years of service required to do so. Plan Document, § 7.4. Thus, no violation of the terms of the Plan deprived Morris of participant status, and he does not have standing to assert his claims in Counts II and III on that ground.[7]

However, Morris asserts that the terms at issue are not those in the actual Plan Document, but the terms as he understood them from the purported Summary Plan Document (SPD), the Plan Information Booklet. Morris contends that the terms of the SPD were violated when he was not allowed to leave his contributions in the Plan, and this violation deprived him of participant status, such that he should still have standing to pursue his claims in Counts II and III. Assuming, because the court need not decide whether it is so, that the terms of an SPD control over those of the actual Plan, and further assuming that the Plan Information Booklet is an SPD, Morris still does not have standing to pursue his claims in Counts II and III.

First, if the answer to Question No. 17 in the Plan Information Booklet does not control the treatment of contributions in the case of an "involuntary" termination, as Morris contends, then no other provision of the Plan Information Booklet is controlling, and only the terms of the Plan Document itself would control. Morris has no standing if the terms of the Plan Document are controlling, because those terms have not been violated depriving him of participant status. If the

---

7. For that matter, if he did have standing, Morris could not prevail on a claim of violation of Plan terms in refusing to allow him to leave his contri-

butions in the Plan to the extent such a claim was based on the terms of the Plan itself.

answer to Question No. 17 in the Plan Information Booklet is controlling, its terms, again, are as follows:

> If you terminate your employment prior to 5 years' participation in the Plan and attaining the age of 55 years or 20 years of service, you will be entitled to a return of your deferrals plus 6% interest compounded annually.

Defendant's Trial Exhibit C, Plan Information Booklet, p. 5. Morris contends that return of his contributions is not dictated by this provision, because he was already 55 years of age at the time of his termination. Winnebago contends that the unambiguous meaning of this provision is that "[i]f an employee has 20 years of service *or* if an employee has five years participation in the plan and has attained the age of 55 years, the employee's deferrals stay in the plan, otherwise the employee's deferrals, plus 6% interest are returned to the employee. Although Morris was 55 years of age, he did not have five years participation in the plan." Defendants' Post Trial Brief, pp. 25–26. The court is not at all convinced that the provision is entirely unambiguous or that Winnebago has correctly stated its meaning if it is unambiguous.[8]

However, striking the years of service language as irrelevant here and irrelevant to the grammatical sense of the remainder, the provision states as follows:

> If you terminate your employment prior to 5 years' participation in the Plan and attaining the age of 55 years, you will be entitled to a return of your deferrals plus 6% interest compounded annually.

The unambiguous meaning of the provision is that both the years of participation and age requirements must be met before termination, or contributions will be returned plus interest. Neither a person with five years of participation, but who was not yet 55 years old, nor a person over 55, but with less than 5 years of participation, at the time of termination was entitled to leave contributions in the plan. Morris met the age requirement, but he did not meet the years of participation requirement. Therefore, no violation of the terms of the Plan as controlled by the terms of the Plan Information Booklet deprived Morris of his participant status. Therefore, Morris does not have standing to pursue his claims in Counts II or III.[9]

### IV.  CONCLUSION

Following trial on the merits, and upon consideration of all evidence and arguments, the court finds that Morris has failed to prove his claim in Count I of the amended complaint alleging interference with ERISA benefits in violation of § 510 of ERISA, 29 U.S.C. § 1140. The court therefore finds for Winnebago on that claim. Morris's failure to prove his claim in Count I has deprived him of standing to pursue his claims in Counts II and III of the amended complaint, and those counts are therefore dismissed.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

---

8. For example, the court finds the provision ambiguous, because it could plausibly be read to attach the five years' of participation to both the age and service requirements, hence it would be interpreted as follows:
> If you terminate your employment (1) prior to five years' participation in the plan and attaining the age of 55 years, or (2) prior to 5 years' participation in the plan and 20 years of service. . . .

This is in fact more nearly what the terms of the actual Plan Document provide in section 7.4(b), in which the age and service requirements are alternatives, but both are coupled to the participation requirement. However, in section 7.4(a)

of the Plan Document, the participation requirement is separate from the age and service requirements, but the age and service requirements are conjoined. Plainly, whatever the outcome of this case, both the Plan Document and the Plan Information Booklet must be rewritten to avoid ambiguities and to make proper disclosure of the terms of the Plan.

9. For that matter, if he did have standing, Morris could not prevail on a claim of violation of Plan terms in refusing to allow him to leave his contributions in the Plan to the extent such a claim was based on the terms of the Plan Information Booklet.