No. 95-3427

Karen M. Karcher,

      Appellee,

   v.

Emerson Electric Co.,

      Appellant.

     *
     *
     *    Appeal from the United States
     *    District Court for the
     *    Eastern District of Missouri.
     *
     *
     *

_____

Submitted:  May 16, 1996

Filed:  September 4, 1996
_____

Before BOWMAN, HEANEY, and WOLLMAN, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Emerson Electric Company (Emerson) appeals the jury verdict in favor of Karen Karcher on her sex and handicap discrimination claims.  On appeal, Emerson raises numerous issues relating to the trial, including:  1) that it was entitled to judgment as a matter of law (JAML) on Karcher's failure-to-promote and retaliation claims; 2) that the district court erred in failing to alter or amend the judgment with respect to emotional distress damages and punitive damages; and 3) that it is entitled to a new trial because of erroneous evidentiary rulings and erroneous jury instructions. We affirm in part and reverse in part.

**I.**

At the time of trial, Karcher was an employee of Alco Controls (Alco), a division of Emerson.  Karcher worked at Alco's St. Louis facility, which manufactures refrigerator parts.  The St. Louis plant employs more than three hundred hourly workers, who are

represented by District No. 9, International Association of Machinists, AFL-CIO (the union). At least one-third of the union employees are female.

Until 1988, there were only three basic types of equipment in the machine shop, the area of the plant where Karcher worked: manual bar feed machines, manual automatic chucker machines, and numerically-controlled machines. The machine shop used two types of employees, set-up workers and operators. The set-up workers manually calibrated the machines to manufacture a particular refrigerator part and were then responsible for maintaining the machine so that it would produce consistently accurate parts. After the machine was set up, the operators ran the machines by feeding the raw materials into the machine, inspecting the completed parts to determine if they met specifications, and making minor adjustments to the machine, if necessary.

In 1988, Emerson purchased two new computerized bar feed machines called Miyanos and two new computerized automatic chucker machines called Pumas. Rather than requiring manual setup as the old machines did, these machines were set up by computer. Thus, where the adjustments in the tooling had previously been made by hand, the set-up person could now make these adjustments by simply pushing buttons on a computer.

Because no plant employee knew how to program or set up the new machines, Emerson initially hired someone outside the company to perform these tasks and to teach these skills to selected male Emerson employees. After Emerson installed the new machines, union and company officials met to negotiate a job classification, wage rate, and selection process for the new set-up jobs. Although the parties dispute the results of this meeting, they agree that the new jobs were classified as "Group 6 general machine shop set-up" (Group 6 set-up positions).

This classification required the employee holding the position to be able to set up any machine in the plant. No Emerson employee was capable of doing this, however, so the parties were required to further negotiate the qualifications for the job. The collective bargaining agreement in place at the time provided that new jobs should be filled "with seniority being the deciding factor, where skill, ability, and physical fitness of the employees' [sic] being considered are relatively equal." This rule could not be applied in a straightforward manner to the Group 6 set-up positions, however, because no employee had direct experience setting up the machines, and the parties disputed what indirect experience would be helpful in undertaking these new jobs.

Both Karcher and Emerson offered the testimony of witnesses who were present at this initial union-employer meeting. One of Karcher's witnesses, Grady Scott (Karcher's step-father), testified that it was his understanding that the new positions would be awarded based solely on seniority. Another of Karcher's witnesses, Tom Bonzo, testified that the positions were to be awarded to the senior bidder with at least six months experience in a machine shop. On the other hand, two of Emerson's witnesses testified that Miyano setup would require prior set-up experience on bar feed equipment and that Puma setup would require prior set-up experience on automatic chuckers. Emerson's witnesses also agreed that workers with prior set-up experience on the old numerically-controlled machines would be qualified to set up both Pumas and Miyanos. According to these witnesses, the senior bidder with the appropriate set-up experience would be awarded the job.

Karcher was hired by Emerson on March 19, 1976. From the time she was hired until the time of trial, she held a variety of jobs at Emerson, including assembler, manual automatic chucker machine operator, drill press operator, bench lathe operator, welder, and tester. Her experience included operating numerically controlled machines and inspecting and finishing parts that had been machined.

None of these jobs, however, involved set-up work.

On September 11, 1978, Karcher became the only woman to work in the automatic screw machine department. Although this position was not primarily a set-up position, she began learning some set-up skills on an automatic screw machine while she held this job. On October 23, 1978, she was removed from this job even though she was having no difficulty learning setup on the screw machine.

Karcher applied for two Group 6 set-up positions, one that was posted on October 18, 1990, and another that was posted on February 4, 1992. Karcher was near the top of seniority on the list of applicants for both of these positions. Ten Emerson employees, including Karcher, bid on the first position, with Karcher being the second most senior bidder. Both the most senior bidder and Karcher, as well as the next two senior bidders, were determined to be "not qualified" for the position. Bill Pearson, the fifth senior bidder got the job. Pearson had bar feed set-up experience on the turret lathe as well as trade schooling. The fourth senior bidder, Anna Ryan, was determined to be not qualified despite her set-up experience with another company. Karcher filed charges with the EEOC and the Missouri Commission on Human Rights with respect to the denial of this promotion. Nine employees, including Karcher, bid on the second job. The senior bidder, after being determined to be not qualified, withdrew his bid. Karcher, the next senior, was again determined to be not qualified. A male employee was given the job.

Between 1988 and 1994, Emerson awarded twenty-six Miyano and Puma set-up positions. All of these positions were awarded to men. Twenty-five of the successful bidders had either set-up experience or experience on the numerically-controlled machines. Grady Scott, however, was awarded a Group 6 set-up position without having

either type of experience.[1]   Scott testified that Karcher was more qualified than he was because she had operated numerous machines and equipment.

Karcher's husband, Jerry Karcher (Jerry) was also an Emerson employee, working as a quality assurance supervisor.  As part of his job, Jerry was required to attend monthly supervisor's meetings.  At these meetings, status reports were presented regarding pending workers' compensation claims and grievances.  During the time he held this job, his wife filed at least six workers' compensation claims after being injured on the job in March of 1983.  Thus, as part of his job, Jerry attended meetings where his wife's claims were discussed.

In early 1990, Karcher applied for a position in the quality assurance department.  Had she been awarded the job, her husband would have been her direct supervisor.  At that time, Jerry told his supervisors that were his wife to be awarded the job, he would leave the company to avoid any conflict of interest.  When Karcher was informed that her husband would be required to leave the company if she were awarded the job, she withdrew her bid.

In early December of 1991, Karcher learned that another Group 6 set-up position would become available because Scott would be retiring because of ill health.  Karcher then attempted to contact Richard Schul, Alco's president, about the potential job opening.  Schul refused to see Karcher, informing her that she needed to discuss the matter through the company's chain of command.  In response to Karcher's attempt to contact Schul, Jerry's supervisors, Vicki Taylor and Jim Wors, met with him on December 9, 1991, and informed him that they believed that a serious conflict

---

[1]Emerson asserted that Scott had set-up experience acquired in the repair shop that he owned.  Scott, himself, testified that he had no such experience.

of interest had developed and that he should begin looking for another job. According to Jerry, Wors stated at this time that "since your wife has these lawsuits and cases pending against us, we feel that we are going to give you sixty days to find another job."

Although Jerry did not find another job within sixty days, he was not terminated. He continued to work for Emerson until July 1992, when he was offered a job at Cerro Copper Product Company. He accepted this position, which offered a higher salary but fewer benefits.

In January 1994, Emerson instituted a "safety pays" bingo game. The bingo jackpot started at twenty-five dollars and increased one dollar for every day in which there was not a lost-time accident in the plant. Each employee who signed up for the game received a bingo sheet, and each day without a lost-time accident a number and letter were drawn in the typical bingo manner. Any employee who had a lost-time accident on the job was disqualified from playing the remainder of the game and the following round. The bingo sign-in sheet stated, "By signing my name below, I certify I have not had any work-related injuries during the previous game round." In a meeting which Karcher did not attend, Taylor and Wors explained that an employee who suffered an on-the-job injury but did not lose work time as a result thereof would be permitted to play the game if the employee reported the injury to his supervisor.

In January 1994, Karcher visited a doctor for treatment of the recurrence of a work injury that she had suffered on July 14, 1993, and which she had reported to her supervisor at the time. On January 10, 1994, Karcher filed a workers' compensation claim for this doctor visit. Karcher lost no work time in relation to this visit, and she did not report the claim to her supervisor. On January 20, Karcher's supervisor presented the bingo sign-in sheet

for Karcher to sign.  When Karcher declined to sign it, she was informed that participation in the game was mandatory.  Karcher therefore signed the form.  The language explaining that an employee who suffered any work-related injury was not permitted to sign the form was obscured by the top of the clipboard.  Karcher was subsequently issued a disciplinary warning for falsification of company records for signing of the bingo form without reporting an injury to her supervisor.  The notice warned that any further infractions could result in discharge.  Karcher filed a grievance over this report, and it was eventually removed from her file, although the warning remained in effect for most of the remainder of 1994.

On October 24, 1994, Karcher filed this complaint against Emerson, alleging discrimination on the basis of her sex and handicap, in violation of  Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq. and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat § 213.111.  She alleged four incidents of discrimination:  a) two incidents of failure to promote to Group 6 set-up positions based on her sex and b) two incidents of retaliation for her filing charges with the EEOC and the Missouri Commission on Human Rights:  threatening to fire her husband and forcing him to leave the company and disciplining and threatening to discharge her with respect to the bingo game.

The jury returned a verdict for Karcher, awarding her $25,000 for lost wages and benefits, $150,000 for emotional pain and suffering, and $350,000 in punitive damages.  Emerson filed a motion for judgment notwithstanding the verdict, for a new trial, and to amend the judgment, which the district court denied.

## II.

Emerson first claims that it was entitled to JAML on Karcher's claims of failure to promote.  We review de novo a district court's

-7-

denial of a motion for JAML, applying the same standard as the district court and overturning the verdict only if the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to support the verdict. Nicks v. State, 67 F.3d 699, 704 (8th Cir. 1995).

Emerson attacks the verdict regarding Karcher's failure-to-promote claims on two fronts, first arguing that Karcher failed to establish a prima facie case of sex discrimination, and then arguing that Karcher failed to prove that Emerson's proffered legitimate rationale for its actions was pretextual.[2] We decline to re-engage in the three-step analysis performed by the district court, but instead limit our review to the ultimate factual issue of whether Emerson intentionally discriminated on the basis of the Karcher's sex. See Parrish v. Immanuel Medical Ctr., No. 95-3514, slip op. at 8 n.2 (8th Cir. Aug. 14, 1996); Winbush v. State of Iowa by Glenwood State Hosp., 66 F.3d 1471, 1479-80 (8th Cir. 1995); Polacco v. Curators of the Univ. of Mo., 37 F.3d 366, 369-70 (8th Cir. 1994); Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 800-01 (8th Cir. 1994).

To determine the merit of Karcher's discriminatory failure-to-promote claims, the jury was required to accept either Emerson's explanation that it failed to promote Karcher because she was not qualified or Karcher's claim that Emerson failed to promote her because she was a woman. This determination involved an evaluation of lengthy testimony concerning the company's promotion policies

---

[2]In a disparate treatment employment discrimination case, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination. The burden of production then shifts to the defendant to set forth legitimate reasons for his actions. Finally, if the defendant carries this burden, the plaintiff assumes the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. Hicks v. St. Mary's Honor Ctr., 509 U.S 502 (1993); Nelson v. Boatman's Bancshares, Inc., 26 F.3d 796, 801 (8th Cir. 1994).

and the qualifications necessary to operate the new computerized equipment.

Emerson attempts to portray the selection process for the Group 6 set-up positions as thoroughly consistent, pointing to Grady Scott as the single example of an employee who was hired without experience either on machine setup or on the numerically-controlled machines. The testimony at trial, however, paints a more ambiguous picture of the selection process. For example, Frank Carter was initially found not qualified for a Miyano job. When he complained to his brother, John Carter, who was the general foreman in the machine shop, he was given the job. In addition, two other male employees were first told that they were not qualified, and then shortly thereafter were deemed to be qualified and given the job.

Moreover, the jury heard evidence from which it could have inferred discriminatory intent on Emerson's part. For example, more than six years after Emerson adopted procedures to choose people for this job, it still had not given any women the experience allegedly necessary to qualify for the job. In addition, from the time Richard Blair, the foreman responsible for choosing several of the disputed positions, was hired in 1986, until the time of trial, no women worked in his department.

We find that the jury reasonably could have inferred from the inconsistent nature of Emerson's selection process and Emerson's failure to select any women or to train women to meet the alleged qualifications of the job that Emerson intentionally discriminated by failing to promote Karcher to a Group 6 set-up position because of her sex. Thus, the evidence supporting a finding of intentional discrimination was sufficient to support the verdict on the failure-to-promote claims.

Emerson claims that it was entitled to JAML on Karcher's retaliation claims. Emerson argues that Karcher lacked standing to assert the rights of her husband and that she failed to state a claim upon which relief could be granted.

To meet the constitutional requirements of standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). The evidence, viewed in Karcher's favor, supports a finding that Emerson's dismissal of her husband caused Karcher to suffer both economic and emotional damage. Although her husband received a higher paying job, the job offered him (and thus her) fewer benefits. Moreover, Karcher testified that she felt responsible for causing her husband to leave a job that he liked and that this caused her emotional stress and placed an additional strain on her marriage. The testimony of her psychiatrist and psychologist corroborated Karcher's claims of emotional distress.

Emerson relies on McCabe v. Sharrett, 12 F.3d 1558 (11th Cir. 1994), and Parsons v. County of Del Norte, 728 F.2d 1234 (9th Cir.) (per curiam), cert. denied, 469 U.S. 846 (1984), for the proposition that it had an unequivocal right to dismiss Karcher's husband when a conflict of interest arose in relation to Karcher's grievances and workers' compensation claims. We find these cited cases to be inapposite, for they involved the question whether a governmental interest in avoiding conflicts of interest outweighs an employee's constitutional right to intimate association. The employees who suffered adverse employment action in those cases did not attribute that action to an impermissible retaliatory motive. Rather, the employees argued that the employers' articulated motive of avoiding a conflict of interest was outweighed by the employees' constitutional right to be married. Thus, the credibility of the

employers' explanation was not at issue.

In contrast, Emerson's true motivation was the primary issue to be resolved at trial. Karcher claimed that Emerson's motivation was retaliatory; Emerson claimed that it was motivated purely by the desire to avoid an emerging conflict of interest. The jury heard sufficient evidence from which it could have believed Karcher and disbelieved Emerson.

Emerson also argues that it was entitled to JAML on Karcher's claim that the company retaliated against her by issuing a written warning with respect to the bingo game. The jury heard evidence that Karcher was forced to sign the form, that the warning instructing employees with work-related injuries not to sign the form was concealed at the time Karcher signed it, and that Karcher's injury had not occurred within the relevant six-month period. In light of this evidence, the jury could have inferred that the disciplinary action taken by the company was taken in retaliation for Karcher's grievances and claims against the company.

## IV.

Emerson argues that the trial court erred in instructing the jury on Karcher's claim for damages for emotional distress, contending that the instruction was not supported by the evidence, was not limited to the employment practices complained of, and did not require adequate proof of causation. We reject these arguments. In particular, we note that in addition to Karcher's testimony, the testimony of Dr. John Canale, Karcher's treating psychiatrist, and that of Dr. Shirley Salmon, her treating psychologist, tied Karcher's depression and emotional stress to her job-related problems.

-11-

We also reject Emerson's claim that Karcher's recovery of emotional distress damages is barred by the Missouri workers' compensation statute. The exclusivity provision of the Missouri workers' compensation statute provides that:

> The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee . . . at common law or otherwise, on account of such accidental injury as death, except such rights and remedies as are not provided for by this chapter.  Mo. Rev. Stat. § 287.120.2.

Clearly, this exclusivity provision can not preempt Karcher's federally created right to recover damages for emotional distress under Title VII. Moreover, we decline to read the provision to bar the recovery of such damages under the MHRA absent clear direction from the Missouri courts, and we have found no such direction.

Although Missouri courts have held that the exclusivity provision bars common law tort actions that arise out of incidents covered by the workers' compensation statute, see, e.g., Hill v. John Chezik Imports, 797 S.W.2d 528, 531 (Mo. Ct. App. 1990), they have not extended the exclusivity provision to bar suits under the MHRA.  Indeed, the language of the MHRA appears to preclude any such finding.  The statute states, in relevant part, that:

> The provisions of this chapter shall be construed to accomplish the purposes thereof and any law inconsistent with any provision of this chapter shall not apply.

We interpret broadly the remedial purpose of the MHRA, and we conclude that an award of emotional damages under the statute is not foreclosed by the possibility that such damages would have been recoverable under the workers' compensation statute.

We agree with Emerson that the punitive damages claim should not have been submitted to the jury, for there was simply insufficient evidence that Emerson acted "with malice or reckless indifference to [Karcher's] federally protected rights," as required under Title VII, or that Emerson's conduct was outrageous as required under the MHRA.  See Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1062 (8th Cir. 1993) (standard under Missouri law); 42 U.S.C. § 1981a(b)(1) (standard under federal law). To support her punitive damages claim with respect to the failure-to-promote claims, Karcher relies on Emerson's alleged deliberate choice to set qualifications that would effectively eliminate all women from obtaining Group 6 set-up positions.  Moreover, Karcher argues that the retaliatory actions taken by Emerson justify a punitive damages award.

This evidence does not support a finding either that Emerson acted with malice or deliberate indifference or that its conduct was outrageous. See Nelson, 26 F.3d at 804 (To recover punitive damages, Missouri law requires a showing of conduct that would "shock the conscience and cause outrage"); Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1216 (6th Cir. 1996) (duplicitous actions of employees were insufficient to support punitive damages award under Civil Rights Act of 1991); Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 n.9 (4th Cir. 1994) (a showing of more than intentional discrimination is required to recover punitive damages under Civil Rights Act of 1991).  Accordingly, the punitive damages award must be set aside.

**V.**

We address the remainder of Emerson's claims only briefly.  Emerson's contention that Karcher was not entitled to a jury trial on her MHRA claims is foreclosed by our recent decision in Gipson v. KAS Snacktime Co., 83 F.3d 225, 231 (8th Cir. 1996).  We have examined each of Emerson's claims of evidentiary error, and find

them to be without merit.  See Smith v. Firestone Tire & Rubber Co., 755 F.2d 129, 134 (8th Cir. 1985) (trial judge has broad discretion regarding the admissibility of evidence).

With respect to Emerson's claims of error relating to the jury instructions, we review the district court's jury instructions for abuse of discretion and on review must determine simply "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 968 (8th Cir. 1995).  We find some merit in two of Emerson's jury instruction claims. First, we agree that the instructions should have included a specific provision on intent.  Second, the instructions should have included a specific instruction on the requirement that plaintiff be qualified for the applied-for positions.  Proof of both intent to discriminate and qualification for the applied-for positions is necessary under a disparate treatment theory of sex discrimination.  See Marzec v. Marsh, 990 F.2d 393, 395 (8th Cir. 1993).

In this case, however, we do not believe that Emerson was prejudiced by the district court's failure to instruct specifically on intent or qualifications.  See Stemmons v. Missouri Dep't of Corrections, 82 F.3d 817, 820 (8th Cir. 1996).  The jury was instructed that to return a verdict for Karcher, it must find that "plaintiff's sex was a motivating factor in defendant's decision."  This instruction was sufficient to convey to the jury that unless Emerson's actions were intentional, Karcher could not recover.  As to the qualifications issue, Emerson argued in closing that it failed to promote Karcher because she was not qualified.  From the instructions given, if the jury believed Emerson that its true reason for failing to promote Karcher was her lack of qualifications for the job, then the jury could not find for Karcher.  Thus, Emerson suffered no prejudice from the absence of more detailed instructions, and we find no reversible error.

Emerson's challenge to the instruction on Karcher's retaliation claim must likewise be rejected.

That portion of the judgment awarding compensatory damages is affirmed. That portion of the judgment awarding punitive damages is reversed, and the case is remanded to the district court for entry of judgment dismissing that portion of Karcher's complaint.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.