**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DIANE SUE HARRIS; MARINA L.
PRASKY,
<u>Plaintiffs-Appellees,</u>

            No. 96-2315

v.

L & L WINGS, INCORPORATED,
<u>Defendant-Appellant.</u>

DIANE SUE HARRIS; MARINA L.
PRASKY,
<u>Plaintiffs-Appellees,</u>

            No. 96-2558

v.

L & L WINGS, INCORPORATED,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CA-95-952-4-22, CA-95-953-4-22)

Argued: October 31, 1997

Decided: December 24, 1997

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge,
and BUTZNER, Senior Circuit Judge.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Michael and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Victoria LaMonte Eslinger, NEXSEN, PRUET, JACOBS & POLLARD, L.L.P., Columbia, South Carolina, for Appellant. Henrietta Urbani Golding, BELLAMY, RUTENBERG, COPELAND, EPPS, GRAVELY & BOWERS, P.A., Myrtle Beach, South Carolina, for Appellees. **ON BRIEF:** J. Michelle Childs, Jennifer J. Aldrich, David Rothstein, NEXSEN, PRUET, JACOBS & POLLARD, L.L.P., Columbia, South Carolina, for Appellant.

_____

**OPINION**

WILKINSON, Chief Judge:

Diane Harris and Marina Prasky sued their former employer, L & L Wings, Inc., for sexual harassment in violation of Title VII. A jury awarded Harris and Prasky compensatory and punitive damages. The district court declined to set aside the awards on Wings' post-trial motions. Wings disputes the sufficiency of the evidence for the jury's verdicts and challenges the trial court's award of attorneys' fees to Harris and Prasky. We affirm.

I.

Defendant Wings is a beachwear retailer that had several stores and four warehouses in the Myrtle Beach, South Carolina area during the time relevant to this lawsuit. Wings employed more than five hundred people year round, a number that swelled to more than one thousand workers during the busy summer season. Harris and Prasky were hourly workers in various capacities in Wings' warehouses. Given that they prevailed before the jury, we must review the evidence on appeal in the light most favorable to them. See Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993).

Harris suffered sexual harassment for much of the time she was employed by Wings. The harassment began in early 1991, when she became assistant floor manager at Wings' Main Warehouse under the supervision of floor manager Ely Levy. This position required Harris

2

to share a desk with Levy. On an almost daily basis, Levy grabbed Harris, embraced her, stroked her hair, massaged her back and shoulders, fondled her legs, and/or followed her around the warehouse. Once Levy pinned Harris against a box and tried to kiss her. In addition to these assaults, Harris endured persistent boasts by Levy about his sexual prowess, offers to promote her in exchange for dating him, and another offer of a hundred dollars if Harris would go to bed with him. Levy even offered to reward Harris' son with a raise if he would convince his mother to go out with him. When Harris resisted Levy's advances and complained to the warehouse manager, Shay Gat, and other members of Wings management about Levy's conduct, the harassment intensified. Levy also retaliated by interfering with Harris' job performance, hiding her paperwork and humiliating her in front of other employees.

While she worked at the Main Warehouse, Harris was placed in uncomfortable situations by other Wings employees as well. Their acts included repeated embraces, continuing attempts to engineer solitary situations, and a swat on her rear end.

Even after Harris escaped the Main Warehouse and Levy's direct supervision, harassment by him continued. In January 1992 Harris became the supervisor of Wings' Warehouses 1 and 2. She still went to the Main Warehouse almost every day to submit paperwork, however, and Levy continued to harass her on a near-daily basis. Every time Harris encountered Levy, he would either touch her or make vulgar comments or sexual advances to her or both. After early 1993, when Harris became supervisor of Warehouse 24, her personal contact with Levy was less frequent, but no less offensive; Levy groped her or made sexually crude remarks to her at virtually every opportunity. The harassment continued unabated until Harris was terminated in July 1993.

While she was employed at Wings, Prasky had to run a similar gauntlet of abuse. When she replaced Harris as Levy's assistant at the Main Warehouse in early 1992, Levy subjected her to much the same treatment as Harris: constant strokes, caresses and embraces as well as verbal harassment, including vulgar comments and sexual advances. When he saw her talking to other employees, he would grab her and say things like, "Don't talk to her. She's my wife,"

3

though of course she was not. On one occasion in 1992, Levy showed Prasky a T-shirt depicting frogs in twelve different sexual positions and said to her, "This is what I can do for you." Again, when Prasky resisted Levy's advances and complained to management, Levy got angry and the harassment intensified.

Prasky also suffered persistent harassment at the hands of other Wings employees. Jacky Heby, Wings' General Manager, tugged on her shorts and gestured as if to pull them down nearly every time he encountered her in the warehouse. He made suggestive and offensive remarks, once insisting that he had seen her perform as a stripper, "same size butt, same size breasts," and that he remembered shoving money into her underwear. And on one occasion Heby dismissed Ely Levy from the desk Levy shared with Prasky, sat beside Prasky himself, and grabbed and rubbed her leg. Norman Kleiman, Wings' swimwear buyer, once put his arm around Prasky and said "You can call it sexual harassment if you want, but you've got a great behind." The harassment ended only when Prasky was terminated in August 1993.

The fact that two female employees experienced a virtually identical course of harassment indicates that this was not an isolated phenomenon. Further, at Warehouse 24 Harris witnessed Nisso Mizrahi, a supervisor, "touching [two female employees], always trying to get them in a corner." Harris' son testified that when he worked at Wings he saw Ely Levy "touch a couple [female employees] on the shoulders, massage their shoulders, rub on their back." And a female former employee testified that she also experienced daily groping and sexual remarks by Ely Levy.

Nor did this harassment take place in a vacuum; the walls, tables, and bathrooms of the workplace were covered with graffiti, including slang references to sexual organs and sex acts. The walls were also covered with posters of scantily clad women, some of which had been defaced with obscene drawings of sexual organs and crude graffiti. As Harris put it, "It was filthy drawings, dirty jokes, racial slurs, the F-word everywhere. Swimwear posters with added parts drawn on." She saw Ely Levy himself sketching a private part on one poster.

4

The evidence presented at trial included the testimony of Harris and Prasky and other employees who witnessed and experienced harassment. Neither Shay Gat nor Ely Levy testified, although Shaul Levy and other Wings managers did appear at trial. In light of this evidence, the jury returned verdicts for both Harris and Prasky on their Title VII sexual harassment claims. The jury awarded Harris $6,933 and Prasky $5,915 in compensatory damages. [1] The jury also awarded Harris and Prasky each $150,000 in punitive damages. Wings moved for judgment as a matter of law or for a new trial. The district court denied these motions and awarded Harris $68,491 and Prasky $57,838 in attorneys' fees and costs, less than each had sought. Wings appeals.

## II.

### A.

Wings first challenges the jury's award of compensatory damages to Harris and Prasky on their Title VII hostile environment claims.[2] The company argues that it cannot be held liable for damages caused by the harassing conduct of its employees because no representative of the company had any notice of the harassment. See, e.g., Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996); Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1130 (4th Cir. 1995). Ample evidence, however, supports the conclusion that the company had notice of its employees' harassing conduct and failed to respond to it. Therefore, the jury's compensatory awards stand.

_____

[1] Harris and Prasky advanced both quid pro quo and hostile environment theories of Title VII liability. The jury found in their favor on both theories, but the district court allowed compensatory damages to be awarded only once to each plaintiff. Because we find that the verdicts on hostile environment harassment are supported by the evidence, we need not consider the claims of quid pro quo harassment.

[2] Wings also challenges the propriety of consolidating the plaintiffs' suits. Federal Rule of Civil Procedure 42(a) approves consolidation of actions that involve a "common question of law or fact." These claims, brought against the same defendant, relying on the same witnesses, alleging the same misconduct, and answered with the same defenses, clearly meet this standard.

5

Wings was put on notice of the harassment Harris and Prasky experienced by repeated, specific complaints that each woman made to several managers. Harris complained of sexual harassment to Shay Gat, the warehouse manager, six to ten times beginning in May or June of 1991. She also complained to Hugo Schiller, Wings' internal management consultant. Harris even complained to Jacob Frank, another warehouse manager, about the harassment she saw Mizrahi perpetrate at Warehouse 24 against other female employees. And Harris testified that a month before she was terminated she threatened that if Wings did not do something about the intolerable work environment the employees "were going to do something." Prasky complained about sexual harassment to Gat and to Frank when he replaced Gat as warehouse manager in April 1993. And she complained to Schiller, once going into his office crying and begging him to get her away from Ely Levy. Prasky also complained to Schiller about the offensive graffiti on the walls and tables of the warehouse.

In this case, the complaints Harris and Prasky lodged gave Wings sufficient notice to impute liability to the company. First we observe that because Wings had no written grievance procedure or sexual harassment policy Harris and Prasky had no guidance about whom to contact in the event of a problem. They logically concluded that it made sense to complain to warehouse manager Gat, who both supervised Ely Levy, the primary harasser, and reported directly to the President of Wings, Shaul Levy. Harris and Prasky also introduced evidence that Shaul Levy was not accessible to them. Though his office was adjacent to the Main Warehouse, it was behind a door secured by a lock to which Harris and Prasky did not have the combination, and he came into the warehouse only infrequently. Furthermore, when the President was in the warehouse, Prasky testified that "He was usually with Shay [Gat] or Ely[Levy] and Jacky [Heby], and any time a regular worker wanted to go up and talk to him, Ely or Jacky or Shay would kind of just shoo them away." From this evidence the jury could reasonably conclude that it was impractical for Harris or Prasky to complain directly to the company President, who was physically separated from them and who, when he was in the warehouse, was usually shielded by the harassers about whom they sought to complain.

Even so, sufficient evidence supports the inference that the message made its way to the top of Wings management. Gat and Shaul

Levy were known to be close, and in fact Shaul Levy testified generally that Gat brought many complaints about Ely Levy to him. Shaul Levy did occasionally come to the warehouse, where he must have witnessed firsthand the profusion of graffiti and pornography that covered the walls and contributed to the sexually hostile environment. In light of all this evidence the jury reasonably concluded that Wings itself had sufficient notice of Harris' and Prasky's plight to be liable for compensatory damages.

B.

We next address Wings' challenge to the jury's award of punitive damages to Harris and Prasky. Punitive damages are "an extraordinary remedy," to be reserved for egregious cases. Stephens v. South Atlantic Canners, Inc., 848 F.2d 484, 489 (4th Cir. 1988). It is well established that exemplary damages are not an element of recovery in every case involving an intentional tort. McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 508-09 (1st Cir. 1996). Specifically, the text and background of the Civil Rights Act of 1991, which authorizes punitive damages, emphasize that this extraordinary remedy is not to be awarded automatically in every successful Title VII suit. The 1991 Act approves punitive damages only "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (emphasis added). Indeed, "[p]laintiffs must first prove intentional discrimination, then must prove actual injury or loss arising therefrom to recover compensatory damages, and must meet an even higher standard (establishing that the employer acted with malice or reckless or callous indifference to their rights) to recover punitive damages." H.R. Rep. No. 40(I), 102d Cong., 1st Sess., at 72 (1991), quoted in McKinnon, 83 F.3d at 507.

This provision was enacted against a backdrop of prevailing doctrine that punitive damages are to be awarded only in cases where the twin aims of punishment and deterrence are paramount. See, e.g., City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-68 (1981) (punitive damages are intended to punish and deter "extreme conduct"); Beauford v. Sisters of Mercy-Province of Detroit, Inc., 816 F.2d 1104, 1109 (6th Cir. 1987) (punitive damages have "generally been limited

7

to cases involving egregious conduct or a showing of willfulness or malice on the part of the defendant"). And even when they are available, punitive damages remain wholly within the jury's discretion and "are never awarded as of right, no matter how egregious the defendant's conduct." Smith v. Wade, 461 U.S. 30, 52 (1983); see also McKinnon, 83 F.3d at 508.

In order to reach the jury on the issue of punitive damages, a plaintiff generally must make a "heightened showing" of the culpable state of mind of the employer, not just of the harasser. See Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 n.9 (4th Cir. 1994). In a sexual harassment case, clearing this "higher hurdle," Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 636 (7th Cir. 1996), demands more than mere proof of the notice required for compensatory damages. "[W]here intentional discrimination occurs outside the scope of the agency relationship between employer and employee -- in a hostile work environment case, for example-- evidence sufficient to support employer liability may not establish that the employer maliciously or recklessly permitted the offending conduct." Kolstad v. American Dental Ass'n, 108 F.3d 1431, 1439 (D.C. Cir.), reh'g in banc granted, 108 F.3d 1446 (D.C. Cir. 1997).

In evaluating the sufficiency of evidence on the malice or reckless indifference of employers, courts have focused on three types of evidence: (1) evidence of the employer's attitude towards sexual harassment; (2) direct statements by the employer about plaintiffs' rights or complaints; and (3) the egregiousness of the conduct at issue.

As to the employer's attitude or state of mind, our sister circuits have considered such evidence as whether the employer instituted a written sexual harassment policy and whether the employer's response adequately addressed complaints of harassment. In some cases, the existence of a written policy instituted in good faith has operated as a total bar to employer liability for punitive damages. See, e.g., Reynolds v. CSX Transp., Inc., 115 F.3d 860, 869 (11th Cir. 1997), petition for cert. filed, 66 U.S.L.W. 3324 (U.S. Oct. 27, 1997) (No. 97-726); Splunge v. Shoney's, Inc., 97 F.3d 488, 491 (11th Cir. 1996); Fitzgerald v. Mountain States Tel. and Tel. Co., 68 F.3d 1257, 1264 (10th Cir. 1995). And in one case the Court of Appeals for the Eighth Circuit based its approval of punitive damages on the fact that

8

the employer had ignored its own written harassment policy and responded to plaintiff's repeated complaints with the unacceptable suggestion that she move to a less attractive job to avoid the harasser. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 576 (8th Cir. 1997). In light of these precedents, Wings' failure to implement any sexual harassment or grievance policy and its utter failure to respond to repeated complaints of pervasive sexual harassment do little to bolster its challenge to the punitive award.

Of course, the absence of a written sexual harassment policy cannot alone establish employer liability even for compensatory damages, Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1180 (2d Cir. 1996); Bouton v. BMW of North America, Inc., 29 F.3d 103, 109 (3d Cir. 1994), so it is in no way dispositive of a claim for punitive damages. And we are not today suggesting that employers are required to enlist a small army of experts and consultants in order to craft such a policy. We note simply that the institution of a written sexual harassment policy goes a long way towards dispelling any claim about the employer's "reckless" or "malicious" state of mind. Had Wings implemented such a policy, the evaluation of the punitive damages question would have taken that into account.

Wings suggests, however, that the complex legal requirements in this whole area left it at sea. We are mindful of the difficulty employers face when dealing with claims of harassment, finding themselves between the rock of an inadequate response under Title VII and the hard place of potential tort liability for wrongful discharge of the alleged harasser. The legal standard of "prompt and adequate remedial action" in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser. Knabe v. Boury Corp., 114 F.3d 407, 414 (3d Cir. 1997) ("[A]n employer, in order to avoid liability for the discriminatory conduct of an employee, does not have to necessarily discipline or terminate the offending employee as long as the employer takes corrective action reasonably likely to prevent the offending conduct from reoccurring."). And a good faith investigation of alleged harassment may satisfy the "prompt and adequate" response standard, even if the investigation turns up no evidence of harassment. Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754 (11th Cir. 1996). Such an employer may avoid liability even if a jury later concludes

9

that in fact harassment occurred. See Fitzgerald , 68 F.3d at 1264. But Wings did absolutely nothing to address the harassment of which Harris and Prasky complained. And this total absence of a response, not to mention a "prompt and adequate" one, is cognizable evidence of Wings' indifference to the federally protected rights of those in its employ.

There is also direct evidence here of the employer's wanton disregard for its employees' rights. In his testimony at trial the President of Wings, Shaul Levy, dismissed questions about why Wings did not have a written policy against sexual harassment by saying: "It's a ridiculous thing. Am I the judge to say who is right and who is wrong. In my opinion, they [the female employees] should go to somebody who has authority to be a judge. I'm not a judge. I'm just an employer." The jury could reasonably interpret this statement as a disavowal by Levy of any responsibility to rid his workplace of sexual harassment. Such direct disavowal of any Title VII responsibilities contributes to the case for punitive damages against the employer. See Beardsley v. Webb, 30 F.3d 524, 531 (4th Cir. 1994); Nicks v. Missouri, 67 F.3d 699, 705 (8th Cir. 1995).

The final factor in evaluating the propriety of punitive damages, the egregiousness of the conduct at issue, also supports the district court's submission of the question of punitive damages to the jury. The evidence presented to the jury described constant, often daily harassment of Harris and Prasky as well as other female employees of Wings. In addition to a torrent of vulgarities, including crude remarks and unwelcome sexual advances, Harris and Prasky were routinely grabbed, groped, fondled and otherwise physically assaulted by their supervisor "every chance he got" and by several other employees. As Prasky described, Levy "was always touching me. . . . He would run his fingers through my hair. He would touch my shoulders. Sometimes touch my leg. He would come up from behind me and grab my waist." Harris endured this conduct for more than two years before she was terminated, and Prasky suffered similar molestation for more than a year before she too was fired. The working environment was permeated with innuendo and graffiti that included "a lot of profanity, a lot of F-words, a lot of drawings, a lot of dirty jokes," and lewd, explicitly embellished posters. This was not a case of ambiguous or episodic behavior on the part of a defendant or of ultra-

10

sensitivity on the part of a plaintiff. Rather, the harassment was crude, persistent, demeaning, unrelenting, and widespread. The two employees were pawed over or propositioned nearly every day they went to work. Taken together, the egregious conduct at issue and the direct evidence of Wings' reckless indifference to the same suffice to sustain the jury's punitive verdicts.

Wings finally contends that most, if not all of the $150,000 Harris and Prasky each received as punitive damages constitutes an impermissible retroactive recovery for harassment that occurred before November 21, 1991, the date of enactment of the Civil Rights Act authorizing punitive damages. See Landgraf v. USI Film Prods., 511 U.S. 244 (1994) (damages provisions of Civil Rights Act of 1991 do not apply retroactively). We disagree. Harris and Prasky introduced sufficient evidence that the harassment continued until they were terminated, long after November 1991, to establish the reasonableness of the jury's punitive damage awards. Moreover, the jury was specifically instructed that it ought not to consider evidence of incidents that occurred before enactment of the Civil Rights Act of 1991 in assessing damages. We have "no reason to depart from`the almost invariable assumption of the law that jurors follow their instructions.'" Shannon v. United States, 512 U.S. 573, 585 (1994) (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)); Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 604 (1985).

III.

Wings also alleges that the district court's calculation of attorneys' fees and costs impermissibly included charges for secretarial work, vague and duplicative entries, and fees and costs for claims on which Harris and Prasky did not prevail. We review the district court's awards for abuse of discretion. Trimper v. City of Norfolk, 58 F.3d 68, 74 (4th Cir. 1995). Harris sought attorneys' fees and costs in the amount of $90,190.21 and received $68,491. Prasky sought attorneys' fees and costs of $71,200.56 and received $57,838. The district court meticulously deducted fees and costs associated with unsuccessful claims, eliminated hours spent on secretarial tasks from its calculation of the lodestar, and declined plaintiffs' request for an upward adjustment to the lodestar figure. This careful consideration of the fee awards was not an abuse of discretion.

11

IV.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

12