**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**SWIFT TRANSPORTATION CO., INC., Defendant.**

**No. Civ. 97–965–MA.**

United States District Court, D. Oregon.

April 14, 1999.

---

A. Luis Lucero, Jr., Claire Cordon, Kathryn Olson, Equal Employment Opportunity Commission, Seattle, WA, for plaintiff.

Edward McGlone, Wallace, Klor & Mann, P.C., Portland, OR, for defendant.

## OPINION & ORDER

MARSH, District Judge.

Plaintiff filed this Title VII action on behalf of all women affected by defendant's former policy that required new drivers who entered its training program to train only with members of their own sex. Defendant Swift Transportation is a publicly held national truckload carrier. Defendant hires both experienced and trainee drivers. Any driver with less than one year's over the road experience is hired as a trainee. Trainees are required to complete an over the road driver training program which entails being paired with a trainer for 40 days or, on average, four to six weeks. After completion of the training, the driver is released to drive solo or to drive as part of a team without regard to sex.

Plaintiff alleges that the effect of defendant's same sex training policy was to delay the time between when a woman was hired and the date she was ultimately assigned to a truck and trainer and placed on the payroll. Plaintiff claims that this delay averaged 6–8 weeks and was far greater than the delay experienced by new male hires. Although some of the language of the complaint suggests that this is a disparate treatment claim (i.e. defendant's policy "had the effect" of discouraging female applicants ...), plaintiff has clarified that it is proceeding solely under a disparate treatment theory of intentional discrimination under § 706 of Title VII, 42 U.S.C. § 2000e–5.

On October 27, 1998, the parties entered a consent decree resolving the liability portion of this action. Within this decree, defendant agreed that it would "not continue to assert the legality of its Original Training Policy under Title VII." Consent Decree, para. 30. While reserving certain defenses, defendant also specifically agreed that the EEOC had "met the jurisdictional pre-requisites to maintain this action and to seek individual and class-wide damages." Consent Decree, para. 32. The parties agreed that defendant's modified training policy could remain in place for an additional 90 days but that after that time, defendant would institute a new,

"gender neutral" training policy in accordance with the guidelines set forth in the decree. This new policy prohibits defendant from soliciting same-sex training requests, and provides that same-sex training will only be made available upon a showing of "legitimate reasons." Consent Decree, para. 34. The decree also calls for defendant to revise its anti-discrimination policy and process for handling complaints and to provide training to all management and supervisory employees regarding the new personnel policies. The new policy is to remain in effect for a 1 year "assessment period," after which the parties will re-examine training options. Defendant agrees to maintain records relative to the effectiveness of the new training policy and provide reports to plaintiff.

Following the entry of the Consent Decree, the sole issue that remains is what, if any, damages should be awarded. In addition to backpay, plaintiff seeks compensatory and punitive damages for both proposed subclasses.

Following a hearing on March 16, 1999, I granted plaintiff's motion to determine the scope of the class and allowed plaintiff to represent two subclasses: (1) all women hired and subject to the training delay; and (2) those who applied but were deterred, and those who were deterred even prior to the application process, due to the defendant's same sex training policy. The class period begins on May 10, 1993, when the policy was initially instituted and ends on September 30, 1997, when the policy was modified to provide training on a "gender neutral" basis, while permitting trainers and trainees to elect same-sex training upon a showing of good cause. During this hearing, I also rejected all of defendant's legal and procedural challenges to the EEOC's ability to maintain this action but reserved ruling on the issue of whether there was any evidence to support plaintiff's demand for punitive damages.

*Standard*

Summary judgment is appropriate if the court finds that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). There is no genuine issue of material fact where the nonmoving party fails "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989).

All reasonable doubts as to the existence of genuine issues of fact must be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir.1989). Where different ultimate inferences can be drawn, summary judgment is inappropriate. *Sankovich v. Life Insurance Company of North America,* 638 F.2d 136, 140 (9th Cir.1981).

*Discussion*

■ Title 42 U.S.C. § 1981a(b) provides in pertinent part: "A complaining party may recover punitive damages under this section against a respondent ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Punitive damages under this provision are designed to punish the wrongdoer, not to compensate the plaintiff. *Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317, 1322 (11th Cir.1999).

■ Plaintiff first argues that it need not provide proof of intentional discrimination to support its punitive damage claim since defendant admitted liability with the consent decree. This argument is flawed in two respects: first, while defendant agreed that it would not contest the legali-

ty of its former policy, it never admitted an intent to discriminate. Second, even if it could be said that plaintiff has established intentional discrimination via the consent decree, the Ninth Circuit (and several other circuits)[1] have held that proof of intentional discrimination, standing alone, is insufficient to warrant sending the issue of punitive damages to the jury. In *Ngo v. Reno Hilton Resort Corporation*, 140 F.3d 1299 (9th Cir.1998), the Ninth Circuit affirmed the trial court's exclusion of punitive damages as a matter of law and held that in light of legislative history, plaintiffs seeking punitive damages under § 1981a must "make a showing beyond the threshold level of intent required for compensatory liability." *Id.* at 1303.

The plaintiff Ngo (an Asian) was a full-time cocktail waitress who was denied a medical leave of absence because the defendant mistakenly had classified her as a part-time employee. Plaintiff returned to work, but was denied seniority and benefits that she should have earned but for the mistaken classification. Plaintiff offered proof that a white cocktail waitress who did not meet the length of service requirements was nevertheless allowed to take a leave of absence for her honeymoon. The jury found in favor of the plaintiff on her race discrimination claim and awarded compensatory damages; the district court declined to submit the issue of punitive damages to the jury and the Ninth Circuit affirmed:

> "While the record clearly supports the jury's finding that [defendant] discriminated against Ngo, it does not support an award of punitive damages. [Defen-

dant] acted negligently and perhaps even recklessly in denying Ngo's request for a leave of absence and discharging her . . . these acts however do not evince an evil motive or a conscious and deliberate disregard for Ngo's federally protected right against discrimination."

*Id.* at 1304.[2]

Shortly after the *Ngo* decision, the Ninth Circuit issued *EEOC v. Wal-Mart Stores, Inc.*, 156 F.3d 989 (9th Cir.1998), reversing a district court's withdrawal of the punitive damage issue from a jury. The plaintiff alleged that she was directly told by an interviewer that she would not be hired because of her pregnancy. The court also found evidence that the employer attempted to cover-up the true reason for her rejection by deliberately losing her interview file and by proffering patently false alternative grounds for not hiring plaintiff. The court found the evidence far more egregious than the facts presented in *Ngo* and concluded that a reasonable jury could find such evidence sufficient to show defendant exhibited a reckless disregard for plaintiff's federally protected rights. *Id.* at 992.

While several decisions from other Circuits are also instructive, the case that I find most factually analogous to the situation presented here is *Ferrill v. The Parker Group*, 168 F.3d 468 (11th Cir.1999). The defendant employer was a telephone marketer that assigned new employees to different work groups by race. Plaintiff, who was an African–American, was assigned to an African–American group that used different scripts and called predominantly African–American areas in what

---

1. *See Dudley,* 166 F.3d 1317, 1322; and *Kolstad v. American Dental Ass'n,* 139 F.3d 958 (D.C.Cir.) ˙(en banc), *cert. granted,* —— U.S. ——, 119 S.Ct. 401, 142 L.Ed.2d 326 (Nov. 2, 1998)

2. Since the statute authorizing punitive damages permits them upon proof of a defendant's "reckless indifference," the Ninth Circuit's reference to the defendant's potentially "reckless" conduct in the context of holding that the conduct failed to satisfy the standard

for submitting punitive damages to the jury as a matter of law is mysterious. If the court had intended to draw a distinction between recklessness and reckless indifference, it failed to explain what the difference was. Such language only serves to complicate an already complicated area. As the D.C. Circuit has noted, "mental-state standards like 'recklessness' and ˙'reckless disregard' are among the most malleable and ambiguous in the law." *Kolstad,* 139 F.3d at 962.

was termed "race-matched calling." Although the case was pursued under 42 U.S.C. § 1981, the punitive damage standard is the same as that for Title VII. The Eleventh Circuit held that while the defendant was liable for compensatory damages for the racially motivated job assignments, there was no evidence of racial animus to support an award of punitive damages. *Id.* at 476.

Another closely analogous case is *Karcher v. Emerson Electric Co.*, 94 F.3d 502 (8th Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1692, 137 L.Ed.2d 820 (1997) because it involves a disparate treatment challenge to a company policy that, at least facially, would not appear to disadvantage any protected group. Karcher was one of the few females employed in defendant's refrigeration part manufacturing plant. Despite her seniority and skills, she was routinely denied promotion to a set-up position on the ground that she was "unqualified." However, other similarly "unqualified" male employees were hired to the position. Plaintiff filed an action alleging that the employer deliberately set the qualifications for the set-up position in such a manner that it effectively eliminated all women from the pool of qualified applicants. She also alleged that defendant retaliated against her following her complaints. The court found sufficient circumstantial evidence of discriminatory intent to affirm the jury's finding of disparate treatment. However, the court held that the district court had erred in submitting the punitive damage issue to the jury, finding the evidence insufficient to meet the heightened standard of recklessness required under § 1981a. *Id.* at 509. *See also Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1126 (7th Cir.1996), (finding insufficient evidence to sustain punitive damage claim where employer "sincerely believed" that plaintiff intentionally asserted false sexual harassment charge) *cert. denied*, 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997); and *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 765 (4th Cir. 1998) (vacating punitive award based upon

evidence that employer's failure to promote had at least been partially based upon valid employee problems).

By contrast, in *Harris v. L & L Wings, Inc.*, 132 F.3d 978 (4th Cir.1997), two female employees claimed that they were continuously subjected to sexually harassing comments, gestures and assaults from supervisors and co-workers over a two year period. Their employer had no sexual harassment policy and in fact, the company president publicly declared that such policies were "ridiculous things" because he knew right from wrong. The female workers thus had no redress from what the court described as "crude, persistent, demeaning, unrelenting and widespread" sexual harassment. The court was cautious to note that the absence of a sexual harassment policy was not determinative and further that "we are not today suggesting that employers are required to enlist a small army of experts and consultants in order to craft such a policy." *Id.* at 983. However, given the severity of the conduct, the employer's failure to take any action to remedy the situation and the company president's direct disavowal of any responsibility under Title VII, the court found the employer's conduct sufficiently reckless to uphold a jury's punitive damage award. *See also Howard v. Burns Bros., Inc.*, 149 F.3d 835 (8th Cir. 1998) (finding sufficient evidence to support a punitive damage claim based upon "management's practice of turning a blind eye to repeated complaints of misconduct" that was both egregious and long-standing (over 2 years)); *Emmel v. Coca–Cola Bottling Co. Of Chicago*, 95 F.3d 627, 636 (7th Cir.1996) (finding jury question on punitive damages where company officers publicly indicated a clear resistance to hiring women in upper management).

The Eleventh Circuit recently held that examples of "egregious" conduct include: "(1) a pattern of discrimination, (2) spite or malevolence; or (3) a blatant disregard for civil obligations." *Dudley*, 166 F.3d 1317,

1322. In *Harris,* the Fourth Circuit focussed upon three types of evidence: "(1) the employer's attitude towards sexual harassment; (2) direct statements by the employer about plaintiffs' rights or complaints; and (3) the egregiousness of the conduct at issue." *Harris,* 132 F.3d at 983.

■ Plaintiff argues that defendant was "recklessly indifferent" to the rights of women and points to the following evidence to support this charge:

(A) that one of the reasons given for the same sex policy was a concern about potentially false claims of sexual harassment being raised by female employees and such a reason evinces negative sexual stereotyping of women;

(B) that other companies addressed sexual harassment concerns in a manner in which women were not delayed in training;

(C) that defendant offered differing rationales for the same sex policy; and

(D) that defendant was aware of the fact that the policy was causing a delay for some female employees and was indifferent to the problem.

A review of the various transcript excerpts reveals that defendant adopted the policy for a number of reasons: (1) concern about sexual harassment liability based upon a large jury verdict lodged against another trucking company and two prior instances of sexual harassment complaints against defendant that were found to be unsubstantiated; (2) concern about sexual harassment in the unsupervised atmosphere of a truck cab; (3) concern about false claims and the inability to truly disprove false claims when there are only two people in the truck cab; and (4) the general atmosphere at the time—i.e. sexual harassment concerns prompted by the Clarence Thomas–Anita Hill hearings.

Plaintiff claims that these varying explanations, when viewed in the light most favorable to it, shows that defendant was at least recklessly indifferent to the impact the policy would have on women. Plaintiff places a great deal of emphasis on the testimony of Jane Hoyt (a recruiter) who testified that she was aware of women who were "frustrated" by the delays caused by the same-sex policy. What plaintiff fails to acknowledge is Hoyt's earlier statement that prior to the institution of the same sex policy, Hoyt was also aware of several women who were only willing to train with a female trainer. In Hoyt's own words, she felt that the difference between the two policies was probably a "wash" in terms of who it favored.[3]

Plaintiff also relies upon an report from Dr. Barbara Gutek. Dr. Gutek concludes based upon her review of the depositions that defendant engaged in "sex stereotyping" when it instituted the same sex policy to avoid "false claims." She also notes that defendant has no hard evidence that its same sex policy actually attracted any female drivers. Gutek opines that the policy was not designed to attract new women drivers and notes that the only program defendant actually had in place to recruit new women drivers was one in which the wives of drivers were offered training and employment incentives so that they could drive with their husbands. Gutek then engages in sexual stereotyping herself when she claims that the wife-recruitment policy would be ineffective because the wives would never want to compete with their husbands for higher ranking jobs.

■ Viewing the evidence in the light most favorable to the plaintiff, it shows that defendant instituted the policy without first studying its potential impacts and without investigating alternatives. There is evidence that defendant was aware of

**3.** I note that Hoyt's statement regarding women who were "frustrated" by the same sex policy came in response to a leading question from the EEOC's counsel—Hoyt simply answered "yes" to a question posed by counsel. Hoyt's comments about women who were deterred by the prospect of training with men and her comment about the "wash" were in her own words.

the training delay, was aware of the fact that at least some potential new female hires were being deterred by that delay and that it took no action to ameliorate the situation. While this conduct might be described as negligent, it falls far short of the type of reckless indifference or egregious conduct necessary to sustain a claim for punitive damages under the case law. As the Fourth Circuit noted, employers are under no legal duty to hire experts and conduct research prior to instituting new personnel policies and their failure to do so cannot, standing alone, subject them to punitive damage liability.

There is no dispute that defendant had both anti-discrimination and sexual harassment policies in place and no claim has been asserted that these policies were legally inadequate. While plaintiff might question the sincerity of defendant's stated desire to increase its female workforce through the adoption of this policy, there is simply no evidence that the defendant intended to limit or restrict new female drivers. As the defendant pointed out during oral argument, the same-sex policy at issue in this case is actually very narrow—it only applied to newly hired drivers who take part in the training program and only applied to the initial training period. The defendant was dealing with a unique situation with unique, potential opportunities for unchecked abuse since the drivers are out on the road, without supervision and must share very close quarters. At best, the defendant hoped that the same-sex policy would encourage more women to apply who might be intimidated by assignment to a male trainer given these unique circumstances; at worst, the defendant adopted the policy to protect itself from litigation of all claims—true or false—that could well arise in such a unique situation. Neither reason equates to an intent to hinder, harm, harass or deter female drivers. There is no evidence of a pattern of discrimination, spite or malevolence or a reckless disregard for Title VII's obligations.

This case stands in stark contrast to those cases allowing punitive damages to go to the jury—the conduct is far from the egregious and long-standing sexual harassment countenanced in *Howard,* there is no direct evidence of discriminatory animus as in the Ninth Circuit's decision in *EEOC v. Wal-Mart,* and there is no evidence that defendant held a hostile attitude towards the law as in *Harris.* The facts in this case are far more analogous to those cases in which punitive damages were stricken when based upon the employer's negligent or even grossly negligent conduct. *See e.g. Ngo,* 140 F.3d 1299; *Kolstad,* 139 F.3d 958; *Karcher,* 94 F.3d 502; *see also Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241 (8th Cir.1998) (affirming district court's refusal to submit punitive damages to jury where employer failed to respond promptly or appropriately to complaints of retaliation); *Taylor v. ScottPolar Corp.,* 995 F.Supp. 1072 (D.Ariz.1998) (rejecting punitive damages where illegal retaliatory conduct contained and not widespread throughout company).

I also find that the various explanations proffered by Swift employees regarding the reasons for instituting the policy are consistent rather than "contradictory,"—they merely show that there were a variety of complementary thoughts and justifications that went into making the policy.

At oral argument, plaintiff contended that it had supplied sufficient evidence of "reckless indifference" to survive summary judgment, but that further discovery could show actual malice. Plaintiff has already deposed all of the decision-makers who were involved in the creation of the policy and has had full discovery regarding the creation of and justifications for that policy. Plaintiff fails to identify what further discovery might be had that could produce probative evidence to survive summary judgment against its claim for punitive damages.

Based on the foregoing, I find that plaintiff has failed to come forward with any evidence that the defendant's adoption and

maintenance of the same-sex training policy was malicious or undertaken with reckless disregard of its obligations under Title VII. Accordingly, defendant's motion for summary judgment (# 27) is GRANTED as against plaintiff's claim for punitive damages. While I have considered Dr. Gutek's report in ruling on summary judgment since plaintiff proffered it for the purpose of establishing a basis for punitive damages, plaintiff's motion for the qualification of Dr. Gutek (# 42) for purposes of trial is DENIED as MOOT.

IT IS SO ORDERED.